IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| CARLA PEDERSON, | Case No. 1:12-cv-00725-CL |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| KLAMATH COUNTY, et al., | |
| Defendants. | |

CLARKE, Magistrate Judge

    Plaintiff Carla Pederson brings claims against defendants Klamath County, Klamath County Sheriff Tim Evinger, Deputy Diaz, and Deputy Mitchell, as well as unknown defendants John Does 1–5, alleging violations of her civil rights. This matter comes before the Court on Defendants' motion for summary judgment (#37) and Plaintiff's motion for partial summary judgment (#39). For the reasons below, Plaintiff's motion should be DENIED, Defendants' motion should be GRANTED, and this case should be dismissed with prejudice.

## BACKGROUND

This case arises from three attempts between August 29 and August 31, 2011 by officers of the Klamath County Sheriff's Office (KCSO) to take a child into protective custody pursuant to a court order. On August 7, 2011, Levi Pederson was arrested in a domestic violence dispute with his girlfriend Tayla Horn. Bowman Aff. 2 (Dkt. #42-2). Levi Pederson's one-year-old child (hereinafter, L.P.) was present during the incident. Horn is L.P.'s maternal aunt and is believed to have been caring for L.P. at the time of the incident.

Following the incident, the Child Welfare Office of the Oregon Department of Human Services (DHS) was contacted to assess the safety of L.P.'s living situation. DHS was unsuccessful at making contact with L.P. and unable to assess the child's safety. Bowman Aff. 1 (Dkt. #42-2). On August 26, 2011, Klamath County Circuit Court Judge Adkisson granted a protective custody order under ORS 419B.150(1)(b) giving DHS temporary custody of L.P. Adkisson Order (Dkt. #42-2).

Plaintiff Carla Pederson is Levi Pederson's maternal aunt, and the great-aunt to L.P. At the time the August 26 protective custody order was issued, DHS believed that L.P. might be located at Plaintiff's residence. DHS worker Tara Holmes had been contacted by an acquaintance of Tayla Horn, who said that Horn left L.P. in Plaintiff's care. Holmes Decl. 2 (Dkt. #48). On August 29, 2011, Deputy Diaz of the KCSO and a representative of DHS visited Plaintiff's home in an attempt to take custody of L.P. Diaz Decl. Ex. 1 at 4 (Dkt. #42-1). While it appeared no one was home, Deputy Diaz noted the presence of toys inside and outside the residence. Id. That same day, Klamath County Circuit Court Judge Osborne granted an order finding that "[l]aw enforcement entry into the residence in which [L.P.] is located will be necessary" and ordering "that the child[] immediately be taken into custody." Osborne Order

(Dkt. #42-2). The order did not specify the address of the residence to be entered. Consequently, on August 30, 2011, Deputy Diaz, Holmes, and several other deputies returned to Plaintiff's home. Diaz Decl. Ex. 1 at 4 (Dkt. #42-1). Deputy Diaz noted that the toys had been moved and that a television was on, making it appear as though people were present inside the house. Id. The deputies forced entry on the front and back doors and then searched the house "from top to bottom." Id. They did not find L.P. or anyone else. Id. Deputy Diaz secured the house and left his business card and a copy of the August 29 order. Id.

In the early morning hours of August 31, 2011, Detective Kennedy and Deputy Mitchell of the KCSO went to Plaintiff's home to take custody of L.P. What followed remains in dispute. Kennedy and Mitchell assert that after knocking at the door and speaking to Plaintiff through a window, Plaintiff consented to Mitchell, but not Kennedy, entering the home. Mitchell Decl. 2 (Dkt. #43); Kennedy Decl. 2 (Dkt. #50). Plaintiff asserts that she never consented to either officer entering the residence, that L.P. had never visited her home, and that Detective Kennedy and Deputy Mitchell pushed in the door to gain entry. Pl.'s Decl. 2 (Dkt. #41). Plaintiff told the officers that L.P. was in California with his grandmother, but she did not know the grandmother's address. Id. While searching the home for the child, Mitchell discovered Tayla Horn inside, who also told him that L.P. was in California. Mitchell Decl. 3 (Dkt. #43).

## STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material issue of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Devereaux v. Abbey, 263 F.3d 1070, 1076

(9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. Playboy Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. Id. at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. Devereaux, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

### I.   Defendants Diaz and Mitchell are entitled to qualified immunity

The doctrine of qualified immunity protects government officials from suit for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier v. Katz, 533 U.S. 194, 202 (2001). A two-prong analysis determines whether qualified immunity doctrine applies. The Court must determine 1) if the "facts alleged show the officer's conduct violated a constitutional right," and if so, 2) "whether th[at] right was clearly established" in light of the specific context of the case. Id. at

201. The Court is "permitted to exercise [its] sound discretion in deciding which of the two prongs . . . should be addressed first." Pearson, 555 U.S. at 236. The specific action in question need not have been previously held unlawful to overcome qualified immunity, but "in light of pre-existing law the unlawfulness must be apparent" and give the official "fair warning" that his conduct is unconstitutional. Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

### A. Deputies Diaz and Mitchell did not violate Plaintiff's Fourth Amendment rights

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. Nevertheless, because the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (internal citations and quotation marks omitted). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." Riley v. California, 573 U.S. ___, ___ (2014) (slip op., at 5). Examples of these exceptions to the warrant requirement are emergency aid, exigent circumstances, and consent. See, e.g., Brigham City, 547 U.S. at 403 (emergency aid doctrine); Ker v. California, 374 U.S. 23, 40 (1963) (to prevent the imminent destruction of evidence); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (consent searches).

The right to be free of unreasonable searches is applicable in the child welfare context. In Calabretta v. Floyd, the Ninth Circuit held that the warrantless, non-emergency search and seizure of an alleged victim of child sexual abuse at her home violated the Fourth Amendment. 189 F.3d 808 (9th Cir. 1999). The court rejected the defendants' assertion that "any check on the welfare of children" triggered the "exigent circumstance[s]" exception to the Fourth Amendment's warrant requirement. The court also rejected the theory that a search or seizure in

a child abuse investigation constituted an administrative search to which neither probable cause nor the warrant requirement applied. Id. at 811–12.

The Ninth Circuit has not yet established whether a valid child custody order functions as a warrant. Although the Ninth Circuit has had occasion to consider the issue, and previously held that "in the context of the seizure of a child pursuant to a child abuse investigation . . . a court order permitting the seizure of the child is the equivalent of a warrant," the relevant portion of that opinion was later vacated on other grounds. Greene v. Camreta, 588 F.3d 1011, 1030 (9th Cir. 2009), vacated in part, ___ U.S. ___, 131 S.Ct. 2020 (2011). Other courts have also considered the issue and held that a court order is the equivalent of a warrant. See Tenenbaum v. Williams, 193 F.3d 581, 602 (2d Cir. 1999) ("In the context of a seizure of a child by the State during an abuse investigation . . . a court order is the equivalent of a warrant."); Gates v. Texas Dept. of Protective & Regulatory Servs., 537 F.3d 404, 429 (5th Cir. 2008) ("the government may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances"); Doe v. Heck, 327 F.3d 492, 517 (7th Cir. 2003) ("[W]e now make it clear that it is patently unconstitutional for government officials to . . . seize a child . . . without a warrant or court order, probable cause, consent, or exigent circumstances.").

In Wernecke v. Garcia, the Fifth Circuit held that "[u]nder the Fourth Amendment, we find it reasonable and permissible for state workers in possession of a facially valid temporary custody order, with a duty under state law to take care of the child, to enter the child's home to look for the child." 591 F.3d 386, 395 (5th Cir. 2009). There, a child's parents were being investigated for refusing the child the medical treatment she required. A state court judge granted an order authorizing officers to take protective custody of the child. Officers and child welfare workers searched the child's home over the parents' objection, but did not find the child.

The parents filed suit alleging, among other claims, a violation of their Fourth Amendment right to be free of unreasonable searches. Id. at 390.

In holding that a child custody order is the equivalent of a warrant, the court reasoned that a child custody order is most akin to an arrest warrant, allowing officers the limited authority to enter a residence to execute the order upon reasonable belief that the child was inside. Id. at 395; cf. Payton v. New York, 445 U.S. 573, 603 (1980) ("[F]or Fourth Amendment purposes, an arrest warrant . . . implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.") "If a court order . . . suffices to meet the Fourth Amendment warrant requirement for a seizure, we see no reason that it should not also meet the warrant requirement in the context of a search of a child's home to locate the child." Wernecke, 591 F.3d at 395. The officers' goal in effecting the search of the residence was not to find evidence of criminality, but to place the endangered child in protective custody. The court explained:

> Once [the child welfare worker] obtained the [protective custody] order, she was not required to acquire an additional court order aimed only at the investigative process—just as a police officer who obtains a facially valid arrest warrant is not required to secure an additional search warrant in order to arrest the suspect in his home.

Id. at 396. After "reflecting upon the policy concerns" regarding the balance between Fourth Amendment protections and the "problem posed to law enforcement by inherently mobile subjects," the court concluded that "when a state social worker obtains from a judge a temporary emergency custody order . . . and has reason to believe the child is within the child's home, the social worker may, consistent with the Fourth Amendment, enter and search the home for the child." Id. at 397.

Here, the Defendants were faced with a similar situation. Like in Wernecke, the officers and DHS workers were attempting to place an endangered child into protective custody. In Wernecke, the twelve-year-old child's parents had absconded with her in the face of attempts to take the child into custody to provide needed medical treatment. Here, one-year-old L.P. was similarly unfindable: his father was incarcerated on the domestic violence charge that precipitated the child welfare investigation, and he did not know either the location or the condition of his child; L.P.'s mother's location was unknown and she had a history of fleeing from DHS; and neither the deputies nor the DHS workers involved could locate L.P. at any of the places they were told the child was. Like in Wernecke, where the officers had an emergency custody order for the child they sought, here the deputies had a court order that found "the need for protective custody" of L.P. and ordering that L.P. "immediately be taken into custody."

The deputies here also had reasonable grounds to believe that L.P. was located at Plaintiff's residence. See Payton, 445 U.S. at 603 (arrest warrant confers the limited authority to enter a dwelling where officers have a reasonable belief the suspect is located). Plaintiff is L.P.'s great-aunt and DHS worker Tara Holmes had been contacted prior to the searches with information that L.P. had been left in Plaintiff's care. Moreover, Deputy Diaz had been to Plaintiff's residence on August 29 and observed children's items in and about the home. Finally, the Defendants entered Plaintiff's residence with the limited purpose of finding L.P. and did not exceed the scope of that purpose; the deputies searched Plaintiff's residence for L.P., and upon failing to find him, left.

"If the alleged conduct did not violate a constitutional right, then the defendants are entitled to [qualified] immunity and the claim must be dismissed." Hopkins v. Bonvicino, 573 F.3d 752, 762 (9th Cir. 2008). Because the court finds that Defendants' searches of Plaintiff's

home were authorized by a court order functioning as a warrant, no constitutional violation occurred, and Defendants are entitled to qualified immunity for the August 30 and August 31 searches.

### B. Law did not clearly establish that Deputies Diaz and Mitchell's entry into Plaintiff's home with a protective custody order would violate Plaintiff's rights

As discussed, no constitutional violation occurred in this case. However, even if the Defendants' conduct did violate the Plaintiff's rights, the court must determine whether the right asserted by Plaintiff was "clearly established" at the time of the alleged unlawful action. Saucier, 533 U.S. at 201. A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); see also Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). "We have repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, ___ U.S. ___, 131 S.Ct. 2074, 2084 (2011) (internal citations omitted). If the right was not clearly established at the time of the violation, then the officer is entitled to qualified immunity. While the order in which these questions are addressed is left to the court's "sound discretion," "it is often beneficial" to perform both steps of the analysis. Pearson, 555 U.S. at 818. Because qualified immunity is an affirmative defense, the burden of proof initially lies with the official asserting the defense. Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982).

In this case, it was reasonable for the officers to believe they had authority to enter Plaintiff's residence. As discussed above, the Ninth Circuit has held that the right to be free from unreasonable search and seizure is applicable in the child welfare context. However, the court has not addressed whether or not a valid child custody order functions as a warrant since the only case to address the issue was vacated in relevant part by the Supreme Court. See Greene v. Camreta, 588 F.3d 1011, 1030 (9th Cir. 2009), vacated in part, ___ U.S. ___, 131 S.Ct. 2020 (2011). In the absence of a clear rule, the Defendants could not have been "on notice that [their] conduct would be clearly unlawful." Saucier, 533 U.S. at 202; see also al-Kidd, 131 S.Ct. at 2083 ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate."). The deputies entered Plaintiff's home reasonably believing they were authorized to do so by the August 29 court order. That order had been signed by a judge just the day prior, and clearly ordered that L.P. "immediately be taken into custody" after finding that "[l]aw enforcement entry into the residence in which [L.P.] is located will be necessary." Moreover, the officers had several pieces of information that reasonably led them to believe that L.P. was located at Plaintiff's residence particularly. As such, even assuming the court order was not sufficient under the analysis above and Deputies Diaz and Mitchell violated Plaintiff's constitutional rights, their conduct was nonetheless reasonable in light of the totality of the circumstances. Deputies Diaz and Mitchell are therefore entitled to qualified immunity.[1]

**II.    Klamath County is entitled to summary judgment on claim for unlawful search and seizure**

Section 1983 liability of a local governing body arises only when "action pursuant to official . . . policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 691 (1978). The circumstances in which Monell liability may be found

---

[1] Because the Court finds the Defendants are entitled to qualified immunity, the Court declines to reach the issue of quasi-judicial absolute immunity.

under § 1983 are "carefully circumscribed." Fuller v. City of Oakland, 47 F.3d 1522, 1534 (9th Cir. 1995).

A § 1983 plaintiff may establish municipal liability in one of three ways: (1) prove that a municipal employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the "standard operating procedure" of the municipality; (2) establish that the individual who committed the constitutional tort was an official with final policy-making authority; or (3) prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. See Gillette v. Delmore, 979 F.2d 1342, 1346–47 (9th Cir. 1992). Whether a particular official has final policy-making authority is a question of state law. Id.

All three of the ways of establishing municipal liability under a § 1983 Monell claim are predicated upon there being an underlying constitutional violation. As discussed, the officers here performed permissible searches authorized by the emergency aid doctrine. There being no underlying constitutional violation, no Monell liability can attach.

### III. Defendants are entitled to summary judgment on claim for intrusion upon seclusion

To prove a claim of intrusion upon seclusion, a plaintiff must prove three elements: (1) that the actor desired to cause an unauthorized intrusion, or that the actor believed that an unauthorized intrusion was substantially certain to result from the actor's invasive act; (2) the actor's intentional intrusion must "be upon the plaintiff's solitude or seclusion or private affairs or concerns"; and (3) the actor's intrusion must be one that would be highly offensive to a reasonable person. Mauri v. Smith, 929 P.2d 307, 311–312 (Or. 1996).

As discussed, the emergency aid doctrine authorized Deputies Diaz and Mitchell to enter Plaintiff's residence. Because the officers' entry into the house was authorized by the

emergency aid doctrine, Plaintiff cannot prove the first element of the tort and this claim fails as a matter of law.

### IV.    Doe defendants are entitled to summary judgment

Plaintiff fails to identify the unnamed Doe defendants, or state why the claims against them should not be dismissed for the reasons discussed above. As such, all of the Doe defendants are entitled to summary judgment.

### RECOMMENDATION

Defendant's motion for summary judgment (#37) should be GRANTED and all claims against Defendants should be dismissed with prejudice. Plaintiff's motion for partial summary judgment (#39) should be DENIED. This Report and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections are filed, any response is due within fourteen (14) days after the date the objections are filed. See Fed. R. Civ. P. 72, 6.

Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED this ___7___ day of August, 2014.

MARK D. CLARKE
United States Magistrate Judge